# UNITED STATES DISTRICT COURT
for the
Southern District of California

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )   Case No. **24mj4449**
Apple ID: Pablo10028@gmail.com )
Directory Services ID: 15623148584 )
("Subject Account") )

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, which is hereby incorporated by reference.

located in the _____Northern_____ District of _____Calfiornia_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, which is hereby incorporated by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 952 | Importation of Controlled Substances |
| 21 U.S.C. § 843(b) | Unlawful use of communication facility to facilitate commission of drug offenses. |

The application is based on these facts:

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____*Christopher Barnes*_____
*Applicant's signature*

Christopher Barnes, HSI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____telephone_____ *(specify reliable electronic means).*

_____[signature]_____
*Judge's signature*

Date: 11/25/2024

City and state: San Diego, California   The Honorable Michael S. Berg, U.S. Magistrate Judge
*Printed name and title*

## Attachment A
## PROPERTY TO BE SEARCHED

Apple Inc. is an internet service provider with its primary computer information systems and other electronic communications and storage systems, records, and data located at One Apple Park Way, Cupertino, California 95014.

Apple hosts the following electronic communication account that is the subject of this search warrant and application: Apple ID: Pablo10028@gmail.com; Directory Services ID: 15623148584 ("Subject Account").

# **ATTACHMENT B**

I.  Service of Warrant.

The officer executing the warrant shall permit Apple Inc. ("ISP"), as custodian of the computer files described in Section II below, to locate the files and copy them onto removable electronic storage media and deliver the same to the officer.

II.  Items to be Seized.

All subscriber and/or user information, all electronic mail, files, cloud storage, location information, search history, images, SMS or text messages, iMessages, phone and FaceTime call logs, voicemail, histories, buddy or friend lists, contacts, iCloud Drives, iCloud files, iCloud Backup and Restore, photos, notes, videos, calendars, message profiles, methods of payment, detailed billing records, access logs, transactional data and any other files or records for the following account:

> Apple ID: Pablo10028@gmail.com
> Directory Services ID: 15623148584
> (**"Subject Account"**)

III.  Search and Items to be Seized by the Government.

The search of the data supplied by the ISP pursuant to this warrant will be conducted by the HSI as provided in the "Procedures For Electronically-Stored Information" section of the affidavit submitted in support of this search warrant and will be limited to the period of August 2, 2024, up to and including August 16, 2024, and to seizure of:

a. Communications, records, attachments, files, and data tending to discuss or establish efforts to import methamphetamine, or some other federally controlled substance from Mexico into the United States;

b. Logs, images, videos, application data, iCloud data, histories, contact or friend lists, profiles, payment and billing records, backup and transactional data, and any other communications, records, and attachments, tending to establish the importation of or conspiracy to import controlled substances;

c. Communications, records, attachments, files, and data tending to identify the user(s) of the Subject Account, and any co-conspirators involved in the activities in III(a) and (b) above;

   d. Communications, records, attachments, files, and data that provide context to any communications or records described above, such as messages sent or received in temporal proximity to any relevant electronic communications and any electronic communications tending to identify users of the Subject Account;

which are evidence of violations of Title 21 U.S.C. Sections 952, and 960 (importation of controlled substances).

# AFFIDAVIT IN SUPPORT OF
# APPLICATION FOR SEARCH WARRANT

I, Christopher Barnes, Special Agent with Homeland Security Investigations ("HSI"), having been duly sworn, hereby state as follows:

## I.
## INTRODUCTION

1. This affidavit is in support of an application by the United States of America for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Apple Inc. (hereafter "Apple") to disclose to the government records and other information, including all Apple iCloud electronically stored digital files, deleted files, and the contents of communications associated with,:

>Apple ID: Pablo10028@gmail.com
>
>Directory Services ID: 15623148584
>
>(the "**Subject Account**")

that are stored at premises owned, maintained, controlled, or operated by Apple, a company headquartered at One Apple Park Way, Cupertino, California 95014. The information to be disclosed by Apple and searched by the government is described in the following paragraphs and in Attachment A through and B, incorporated herein. There is probable cause that these records and information constitute evidence, fruits, and instrumentalities of violations of federal criminal law, namely, Title 21 U.S.C. Sections 952, 960, and 963 (importation of controlled substances), ("**Target Offense**"), as described in **Attachment B**.

## II.
## BACKGROUND AND EXPERIENCE

2. I am an investigative or law enforcement officer within the meaning of 18 U.S.C. § 2510(7); that is, an officer of the United States, who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. §

1

2516. I have been employed as a Special Agent with Homeland Security Investigations ("HSI") since May of 2020. I am currently assigned to the HSI Office of the Special Agent in Charge, in San Diego, California. I am a graduate of the Federal Law Enforcement Training Center ("FLETC") and have completed 960 hours of training as part of the Criminal Investigator training Program and HSI Special Agent Training Programs at the FLETC. As a result of my training and experience as a Special Agent, I am familiar with federal criminal laws relating to fraud and money laundering violations. As part of my training, I have completed course studies in, among other things, criminal law, constitutional law, search and seizures, courtroom procedure, evidence processing, drug smuggling, and other drug-related offenses.

3. During my training at FLETC, I learned the fundamentals of how to conduct criminal investigations including, but not limited to, gathering of evidence, preservation of a crime scene, and use of electronic evidence – all in relation to violations of the United States Code. Based on my training, personal experience, and participation in criminal investigations, I have become familiar with the methods and techniques used by individuals engaged in money laundering to conceal the nature of illicit proceeds.

4. As an HSI Special Agent, I am a Federal Law Enforcement Officer within the meaning of Rule 41(b) of the Federal Rules of Criminal Procedure, that is, a government agent engaged in the enforcement of the criminal laws of the United States, and thereby authorized to request issuance of federal search and seizure warrants. As a Special Agent with HSI, I have previously worked in a Contraband Smuggling Unit which involves the investigation of Drug Trafficking Organizations ("DTO") responsible for importation and distribution of controlled substances into and through the Southern District of California. During my tenure with HSI, I have participated in the investigation of various DTOs involved in the importation and distribution of controlled substances into and through the Southern District of California. Since November of 2023, I have been assigned to the HSI Costa Pacifico Money Laundering

Task Force which focuses on international money laundering and bulk cash smuggling of illicit proceeds. Through my training, experience, and work with other law enforcement officers experienced in drug trafficking and money laundering investigations, I have gained a working knowledge of the operational habits of drug traffickers and money launderers. My work on drug trafficking and money laundering investigations has resulted in the issuance of arrest warrants, search warrants, seizure warrants, and the indictments of persons for controlled substances violations.

5. Through my training, experience, and conversations with other members of law enforcement, I have gained a working knowledge of the operational habits of transnational criminal organizations. I am aware that it is common practice for organized criminal organizations to work in concert with other individuals and to do so by utilizing cellular telephones. Because they are mobile, the use of cellular telephones permits members of criminal networks to easily carry out various tasks related to their activities, including, *e.g.*, remotely monitoring the progress of shipments while still in transit, providing instructions to couriers, warning accomplices about law enforcement activity, and communicating with co-conspirators who are transporting of illicit proceeds.

6. In preparing this affidavit, I have conferred with other agents and law enforcement personnel who are experienced in drug trafficking and money laundering investigations. Further, I have personal knowledge of the following facts, or have had them related to me by persons mentioned in this affidavit. This affidavit is intended to show simply that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter. I set forth only facts necessary to establish the foundation for the requested order. Conversations are set forth below in substance unless noted. Many of the communications described and quoted in this affidavit occurred in Spanish. Here, I offer good-faith summary translations of these communications for the purpose of establishing probable cause. My interpretations of certain statements are set forth in brackets and are based upon my knowledge of this

3

investigation, my training, and my experience. Dates, times, and amounts are approximate.

7. Based on the facts as set forth in this affidavit, there is probable cause to believe that the information described in Attachment A contains evidence of violations of the Target Offenses as described in Attachment B. I am aware that it is common practice for drug traffickers to work in concert utilizing cellular telephones to maintain and store communications and related items with co-conspirators to further their criminal activities. A common tactic utilized by drug traffickers is to import controlled substances into the United States or transport-controlled substances within the United States by concealing the controlled substances in vehicles, and sometimes hidden inside other containers, that travel into or within the United States, specifically, within San Diego County prior to further distribution of the controlled substances. With respect to the importation, transportation, and distribution of drugs in this manner, I am aware that drug traffickers in Mexico and the United States frequently communicate with the individuals responsible for importation, transporting, and distributing the controlled substances within the United States. These communications can occur before, during and after the drugs are imported, transported, and distributed within the United States. For example, prior to the importation, and subsequent transportation, drug traffickers frequently communicate with the driver regarding arrangements and preparation for the drug importation/transportation. When the importation and subsequent transportation is underway, drug traffickers frequently communicate with the driver to remotely monitor the progress of the drugs, provide instructions to the driver and warn accomplices about law enforcement activity. When the drugs have been successfully imported into the United States and are to be transported further into the United States, drug traffickers may communicate with the courier or driver to provide further instructions regarding the transportation of the drugs for distribution within the United States.

4

## III.
## JURISDICTION

8. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## IV.
## FACTS SUPPORTING PROBABLE CAUSE

9. On August 16, 2024, at approximately 12:05 PM, Pablo MARTINEZ Juarez, ("MARTINEZ"), a United States citizen, applied for entry into the United States from Mexico through the Otay Mesa Port of Entry vehicle lane #5. MARTINEZ was the driver, sole occupant, and registered owner of a 2008 Ford F-250 ("the vehicle") bearing Nevada license plates.

10. A Customs and Border Protection Officer ("CBPO") who was conducting pre-primary operations received two negative declarations from MARTINEZ, who stated he was going to Las Vegas, Nevada. The CBPO noticed LOPEZ's eyes were red and proceeded to search his bag. The CBPO performed an inspection of the vehicle and noticed tampering on the gas tank. MARTINEZ and the vehicle were then referred to secondary inspection for further inspection.

11. A CBPO operating the Z-portal x-ray machine noticed anomalies in the dashboard and gas tank of the vehicle. MARTINEZ was then detained and escorted to the security office.

12. A Canine Enforcement Team was conducting secondary inspection operations when a Human and Narcotics Detection Dog alerted to the dashboard of the vehicle.

13. Further inspection of the vehicle resulted in the discovery of 10 packages concealed in the dashboard of the vehicle, with a total approximate weight of 12.02 kgs

(26.49 lbs). A sample of the substance contained within the packages field tested positive for the characteristics of cocaine.

14. MARTINEZ was placed under arrest at approximately 3:32 PM.

15. MARTINEZ was charged with a violation of Title 21, United States Code, 952 and 960, importation of a controlled substance.

16. MARTINEZ's cell phone was found and seized by a Customs and Border Protection Officer (CBPO) who was tasked to perform a secondary inspection of the Vehicle and inventory all the property seized from the Defendant and his vehicle. The cell phone was found by the CBPO in the right pants pocket of the Defendant.

17. Based upon my experience and training, consultation with other law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that telephone numbers, contact names, electronic mail (email) addresses, appointment dates, messages, pictures and other digital information are stored in the memory of the **Subject Account** linked to MARTINEZ's cellphone. In light of the above facts and my experience and training, there is probable cause to believe that Defendant was using the **Subject Account** to communicate with others to further the importation of illicit narcotics into the United States. Further, in my training and experience, narcotics traffickers may be involved in the planning and coordination of a drug smuggling event in the days and weeks prior to an event. Co-conspirators are also often unaware of a defendant's arrest and will continue to attempt to communicate with a defendant after their arrest to determine the whereabouts of the narcotics.

18. Based upon my training and experience, it is also not unusual for individuals, such as MARTINEZ, to attempt to minimize the amount of time they were involved in their smuggling activities, and for the individuals to be involved for weeks and months longer than they claim. Accordingly, I request permission to search the **Subject Account** for data beginning on August 2, 2024, up to and including August 16,

6

2024.

19. Additionally, it is believed that the records are still available to Apple as a request to preserve was made under 18 U.S.C. § 2703(f).

## V.

## INFORMATION REGARDING APPLE ID AND iCLOUD

20. Apple provides a variety of services that can be accessed from Apple devices or, in some cases, other devices via web browsers or mobile and desktop applications ("apps"). As described in further detail below, the services include email, instant messaging, and file storage:

    a. Apple provides email service to its users through email addresses at the domain names mac.com, me.com, and icloud.com.

    b. iMessage and FaceTime allow users of Apple devices to communicate in real-time. iMessage enables users of Apple devices to exchange instant messages ("iMessages") containing text, photos, videos, locations, and contacts, while FaceTime enables those users to conduct video calls.

    c. iCloud is a file hosting, storage, and sharing service provided by Apple. iCloud can be utilized through numerous iCloud-connected services and can also be used to store iOS device backups and data associated with third-party apps.

    d. iCloud-connected services allow users to create, store, access, share, and synchronize data on Apple devices or via icloud.com on any Internet-connected device. For example, iCloud Mail enables a user to access Apple-provided email accounts on multiple Apple devices and on icloud.com. iCloud Photo Library and My Photo Stream can be used to store and manage images and videos taken from Apple devices, and iCloud Photo Sharing allows the user to share those images and videos with other Apple subscribers. iCloud Drive can be used to store presentations, spreadsheets, and other documents. iCloud Tabs and bookmarks enable iCloud to be used to synchronize bookmarks and webpages opened in the Safari web browsers on all of the user's Apple

7

devices. iWork Apps, a suite of productivity apps (Pages, Numbers, Keynote, and Notes), enables iCloud to be used to create, store, and share documents, spreadsheets, and presentations. iCloud Keychain enables a user to keep website username and passwords, credit card information, and Wi-Fi network information synchronized across multiple Apple devices.

    e.    Game Center, Apple's social gaming network, allows users of Apple devices to play and share games with each other.

    f.    Find My iPhone allows owners of Apple devices to remotely identify and track the location of, display a message on, and wipe the contents of those devices. Find My Friends allows owners of Apple devices to share locations.

    g.    Location Services allows apps and websites to use information from cellular, Wi-Fi, Global Positioning System ("GPS") networks, and Bluetooth, to determine a user's approximate location.

    h.    App Store and iTunes Store are used to purchase and download digital content. iOS apps can be purchased and downloaded through App Store on iOS devices, or through iTunes Store on desktop and laptop computers running either Microsoft Windows or Mac OS. Additional digital content, including music, movies, and television shows, can be purchased through iTunes Store on iOS devices and on desktop and laptop computers running either Microsoft Windows or Mac OS.

21.    Apple services are accessed through the use of an "Apple ID," an account created during the setup of an Apple device or through the iTunes or iCloud services. A single Apple ID can be linked to multiple Apple services and devices, serving as a central authentication and syncing mechanism.

22.    An Apple ID takes the form of the full email address submitted by the user to create the account; it can later be changed. Users can submit an Apple-provided email address (often ending in @icloud.com, @me.com, or @mac.com) or an email address associated with a third-party email provider (such as Gmail, Yahoo, or Hotmail). The Apple ID can be used to access most Apple services (including iCloud, iMessage, and

FaceTime) only after the user accesses and responds to a "verification email" sent by Apple to that "primary" email address. Additional email addresses ("alternate," "rescue," and "notification" email addresses) can also be associated with an Apple ID by the user.

23. Apple captures information associated with the creation and use of an Apple ID. During the creation of an Apple ID, the user must provide basic personal information including the user's full name, physical address, and telephone numbers. The user may also provide means of payment for products offered by Apple. The subscriber information and password associated with an Apple ID can be changed by the user through the "My Apple ID" and "iForgot" pages on Apple's website. In addition, Apple captures the date on which the account was created, the length of service, records of log-in times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to and utilize the account, the Internet Protocol address ("IP address") used to register and access the account, and other log files that reflect usage of the account.

24. Additional information is captured by Apple in connection with the use of an Apple ID to access certain services. For example, Apple maintains connection logs with IP addresses that reflect a user's sign-on activity for Apple services such as iTunes Store and App Store, iCloud, Game Center, and the My Apple ID and iForgot pages on Apple's website. Apple also maintains records reflecting a user's app purchases from App Store and iTunes Store, "call invitation logs" for FaceTime calls, "query logs" for iMessage, and "mail logs" for activity over an Apple-provided email account. Records relating to the use of the Find My iPhone service, including connection logs and requests to remotely lock or erase a device, are also maintained by Apple.

25. Apple also maintains information about the devices associated with an Apple ID. When a user activates or upgrades an iOS device, Apple captures and retains the user's IP address and identifiers such as the Integrated Circuit Card ID number ("ICCID"), which is the serial number of the device's SIM card. Similarly, the

9

telephone number of a user's iPhone is linked to an Apple ID when the user signs into FaceTime or iMessage. Apple also may maintain records of other device identifiers, including the Media Access Control address ("MAC address"), the unique device identifier ("UDID"), and the serial number. In addition, information about a user's computer is captured when iTunes is used on that computer to play content associated with an Apple ID, and information about a user's web browser may be captured when used to access services through icloud.com and apple.com. Apple also retains records related to communications between users and Apple customer service, including communications regarding a particular Apple device or service, and the repair history for a device.

26.     Apple provides users with five gigabytes of free electronic space on iCloud, and users can purchase additional storage space. That storage space, located on servers controlled by Apple, may contain data associated with the use of iCloud-connected services, including: email (iCloud Mail); images and videos (iCloud Photo Library, My Photo Stream, and iCloud Photo Sharing); documents, spreadsheets, presentations, and other files (iWork and iCloud Drive); and web browser settings and Wi-Fi network information (iCloud Tabs and iCloud Keychain). iCloud can also be used to store iOS device backups, which can contain a user's photos and videos, iMessages, Short Message Service ("SMS") and Multimedia Messaging Service ("MMS") messages, voicemail messages, call history, contacts, calendar events, reminders, notes, app data and settings, Apple Watch backups, and other data. Records and data associated with third-party apps may also be stored on iCloud; for example, the iOS app for WhatsApp, an instant messaging service, can be configured to regularly back up a user's instant messages on iCloud Drive. Some of this data is stored on Apple's servers in an encrypted form but can nonetheless be decrypted by Apple.

27.     In my training and experience, evidence of who was using an Apple ID and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above. This evidence may establish the

"who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

28. For example, the stored communications and files connected to an Apple ID may provide direct evidence of the offenses under investigation. Based on my training and experience, instant messages, emails, voicemails, photos, videos, and documents are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation.

29. In addition, the user's account activity, logs, stored electronic communications, and other data retained by Apple can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

30. Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

31. Other information connected to an Apple ID may lead to the discovery of additional evidence. For example, the identification of apps downloaded from App Store and iTunes Store may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators. In addition, emails, instant messages, Internet activity, documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

32. Therefore, Apple's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Apple's services. In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

## VI.
## PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

33. Law Enforcement Officials previously extracted data from the iPhone attached to the Subject Account. A full extraction was unsuccessful due to the iPhone losing power before the extraction attempt. Additional extraction attempts would result in the same outcome due to the iPhone having lost power.

## VII.
## PROCEDURES FOR ELECTRONICALLY STORED INFORMATION

34. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Apple to disclose to the government copies of the records and other information (including the content of communications and stored data) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

35. Federal agents and investigative support personnel are trained and experienced in identifying communications relevant to the crimes under investigation. The ISP's personnel are not. It would be inappropriate and impractical for federal agents to search the ISP's vast computer network for the relevant accounts and then to analyze the contents of those accounts on the ISP's premises. The impact on its business would be disruptive and severe.

36. Therefore, I request authority to seize all content, including electronic mail and attachments, stored instant messages, stored voice messages, photographs, and any other content from the subject ISP accounts, as described in Attachment B. In order to accomplish the objective of the search warrant with a minimum of interference with the ISP's business activities, to protect the privacy of its subscribers whose accounts are not authorized to be searched, and to effectively pursue this investigation, agents seek authorization to allow the ISP to make digital copies of the entire contents of the accounts subject to seizure. Those copies will be provided to me or to an authorized federal agent. The copy will be imaged, and the image will then be analyzed to identify communications and other electronic records subject to seizure pursuant to Attachment B. Relevant electronic records will be copied to separate media. The original media will be sealed and maintained to establish authenticity, if necessary.

37. Analyzing the data to be provided by the ISP may require special technical skills, equipment, and software. It may also be time-consuming. Searching by keywords, for example, often yields many thousands of "hits," each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant "hit" does not end the review process. Keyword searches do not capture misspelled words, reveal the use of coded language, or account for slang or typographical errors. Keyword searches are further limited when electronic records are in or use foreign languages. Certain file formats also do not lend themselves to keyword searches. Keywords search text. Attachments to electronic mail messages are often in proprietary formats that do not store data as searchable text.

Instead, such data is saved in a proprietary non-text format. And, as the volume of storage allotted by service providers increases, the time it takes to properly analyze recovered data increases dramatically. Internet Service Providers like Microsoft and Google do not always organize the electronic files they provide chronologically, which makes review even more time consuming and may also require the examiner to review each page or record for responsive material.

38.   Based on the foregoing, searching the recovered data for the information subject to seizure pursuant to this warrant may require a range of data analysis techniques and may take weeks or even months. Keywords need to be modified continuously based upon the results obtained and, depending on the organization, format, and language of the records provided by the ISP, examiners may need to review each record to determine if it is responsive to Attachment B. The personnel conducting the examination of the ISPs' records will complete the analysis within ninety (90) days of receipt of the data from the service provider, absent further application to this court.

39.   Based upon my experience and training, and the experience and training of other agents with whom I have communicated, it is necessary to review and seize all electronic communications that identify any users of the **Subject Account** and any electronic communications sent or received in temporal proximity to incriminating messages that provide context to the incriminating communications.

40.   All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

## VIII.
## CONCLUSION

41.   Based on the foregoing, I request that the Court issue the proposed search warrant for the Subject Account, as described in Attachment A, for evidence as outlined in Attachment B.

I swear the foregoing is true and correct to the best of my knowledge and belief.

14

*Christopher Barnes*
Christopher Barnes Special Agent, HSI

Sworn and attested to under oath by telephone, in accordance with Federal Rule of Criminal Procedure 4.1, this 25th day of November, 2024.

_____
Honorable MICHAEL S. BERG
United States Magistrate Judge

15